USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 7/6/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                              :
GE FUNDING CAPITAL MARKET                                     :
SERVICES, INC. and TRINITY FUNDING                            :
COMPANY, LLC,                                                 :    15 Civ. 1069 (LGS)
                                                              :
                          Plaintiffs,                         :    **OPINION AND ORDER**
                                                              :
              -against-                                       :
                                                              :
NEBRASKA INVESTMENT FINANCE                                   :
AUTHORITY,                                                    :
                          Defendant.                          :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      Plaintiffs GE Funding Capital Market Services, Inc. and Trinity Funding Company, LLC (collectively, "GE") bring this action against Defendant Nebraska Investment Finance Authority ("NIFA") seeking declaratory and equitable relief and money damages arising from NIFA's alleged breach of several investment agreements (the "Investment Agreements"). Each of the Investment Agreements was established in connection with a certain series of bonds issued by NIFA and obligated GE to pay a fixed interest rate to NIFA on amounts under deposit. The present dispute turns on whether NIFA was entitled to interest payments following redemption of the bonds. The Court previously denied in substantial part NIFA's motion for judgment on the pleadings, concluding that the Investment Agreements are ambiguous on that point. *See GE Funding Capital Mkt. Servs., Inc. v. Nebraska Inv. Fin. Auth.*, No. 15 Civ. 1069, 2016 WL 4784002, at *3 (S.D.N.Y. Sept. 14, 2016). NIFA now moves for partial summary judgment[1] on

---

[1] The following six investment agreements are at issue on this motion: the 1994 A-1 B-1 Investment Agreement, the 1994 C-1 D-1 Investment Agreement, the 1995 A Investment Agreement, the 1995 B Investment Agreement, the 1996 A Investment Agreement and the 2000 A-B Investment Agreement. GE also sued on a seventh investment agreement -- the 1994 A-D

the ground that the record evidence is so one-sided in favor of its interpretation of the Investment Agreements that no reasonable jury could find for GE. For the following reasons, NIFA's motion is denied.

## I.  BACKGROUND

The following facts are taken from the parties' statements pursuant to Local Civil Rule 56.1, the Investment Agreements and indentures of trust attached to the Second Amended Complaint, and the parties' submissions on this motion. For the purposes of this motion, all factual disputes are resolved, and all reasonable inferences are drawn, in Plaintiffs' favor. *See Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 71–72 (2d Cir. 2016).

NIFA is an independent instrumentality established under the Nebraska Investment Finance Authority Act, Neb. Rev. Stat. §§ 58-201 to 58-272. NIFA's activities include providing sources of mortgage financing at reasonable rates to Nebraska residents of low and moderate income levels. NIFA issues bonds to fund these activities. The bond series relevant to this dispute were issued between 1994 and 2000 and are governed by a General Indenture of Trust (the "General Indenture") and several series-specific supplemental indentures executed by NIFA and its Trustee -- initially Norwest Bank Minnesota, N.A. and now Wells Fargo Bank, N.A. ("Wells Fargo"). The General Indenture addresses, among other things, the general terms and provisions of security for the bonds, investment of bond proceeds and procedures for redeeming the bonds. The supplemental indentures contain terms specific to each bond series, such as maturity dates, interest rates, payment schedules and redemption provisions.

---

Investment Agreement -- but NIFA has not moved for summary judgment with respect to that agreement.

The General Indenture created a system of "special Funds and Accounts" to hold the proceeds from the bonds. It established nine funds, each with a specific purpose. For example, the "Revenue Fund" was to hold "all Revenues derived from the Mortgage Loans (including Defaulted Mortgage Loans) and the Mortgage-Backed Securities." Within each fund, the General Indenture provided for the creation of a separate account for each bond series. NIFA is required by statute to invest funds securing a bond issue in the manner permitted by the applicable indentures. *See* Neb. Rev. Stat. § 58-240(1). Here, the supplemental indentures direct Wells Fargo, as the Trustee, to invest monies in the funds and accounts in the Investment Agreements.

The Investment Agreements are examples of Guaranteed Investment Contracts ("GICs"). A GIC is a specific type of investment contract that is competitively bid. State and municipal entities can invest the proceeds of tax-exempt bonds in GICs.

When a municipal bond issuer, such as NIFA, seeks to enter into a GIC, it conducts a process in which potential GIC providers, such as GE, bid on the proposed GIC. As part of the bidding process, the issuer prepares bid documents containing details about the proposed GIC. The bid documents are reviewed by the issuer and the issuer's underwriters and counsel before they are circulated to potential providers. On the basis of the bid documents, providers decide whether to bid on the proposed GIC and, if so, what rate they will offer. At a certain time specified by the bid documents, the issuer analyzes the bids received and selects the highest qualifying bid as the winner. After the GIC provider with the winning bid is notified, it sends the first draft of the formal contract to the issuer. The contract would memorialize the pricing terms that had been set at the bid stage. It would be highly unusual for the parties to a GIC to negotiate its material terms after the municipal issuer has selected the winning bidder because such

negotiation would defeat the purpose of a bid. The termination provision of a GIC is a material term that affects the rate that providers are willing to bid.

In accordance with the process outlined above, NIFA circulated bid forms in advance of the execution of each of the Investment Agreements. The bid forms for five of the six Investment Agreements at issue provided that the agreement would terminate on a date certain or "upon earlier redemption or maturity of the Bonds." These bid forms also stated that the resulting agreement "must conform to the term of the bid and the bidding specifications." The bid form for the February 24, 2000, Investment Agreement did not provide for early termination upon bond redemption, but when returning the completed bid form to NIFA, GE representatives wrote at the top of the form, "Float fund is too long" and "Bid based on same terms + conditions as our 2/22/96 Agrmt for their '96 A Bonds." This bid form stated that the resulting agreement "must conform to the terms of the bidding specifications." All six bid forms also state that NIFA "reserves the right to negotiate the terms of the Investment Agreement."

GE was the successful bidder and prepared the first draft of each of the Investment Agreements. Certain provisions in some of the Investment Agreements were negotiated by the parties, but GE denies that they negotiated the termination provisions. There is no documentary evidence, and no witness has any recollection, of such negotiations. Each executed Investment Agreement provides that it "shall terminate on the Termination Date" -- a date certain set forth in each agreement and ranging from March 2, 2026, to March 2, 2035 -- "unless earlier terminated in accordance with its terms."

According to Chris Patronis, a former GE employee who was involved in the bidding process, GE's subjective understanding at the time it submitted its bids was that the resulting Investment Agreements would terminate upon redemption of the bonds. GE priced its bids

4

based on its internal estimates that redemption would occur in seven to twelve years, depending on the particular Investment Agreement, and the rates contained in the executed Investment Agreements are identical to the rates submitted in GE's bids. Patronis testified that if the termination provisions had changed from those in the bid form to provisions stating that the Investment Agreements would not terminate upon redemption of the bonds, GE would have changed its bids to a lower rate or not bid at all.

Around the same time that the Investment Agreements were drafted and executed, GE entered into at least 1,857 similar agreements with other parties. In 58 of those agreements, the parties included explicit language providing for termination upon bond redemption. The other 1,799 agreements do not contain such language.

NIFA redeemed the bonds on a rolling basis between 2005 and 2010. NIFA directed Wells Fargo to leave the Investment Agreements open after the final redemption of the related series of bonds and, at Wells Fargo's request, indemnified Wells Fargo from any liability that would result from that direction. In internal emails, NIFA officials acknowledged that GE might interpret the Investment Agreements as having terminated upon bond redemption but concluded that NIFA "ha[s] the right to continue the [Investment Agreements]." GE ultimately discovered that the bonds had been redeemed and commenced this lawsuit for declaratory relief and recovery of "the interest, profits or other comparable amounts paid by GE to NIFA" under the Investment Agreements.

## II. STANDARD

Summary judgment is appropriate where the record before the court establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute as to a material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party bears the initial burden of informing the court of the basis for the summary judgment motion and identifying those portions of the record that demonstrate the absence of a genuine dispute as to any material fact. Fed. R. Civ. P. 56(c)(1); *see, e.g.*, *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Victory v. Pataki*, 814 F.3d 47, 58–59 (2d Cir. 2016). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S at 248; *accord Pippins v. KPMG, LLP*, 759 F.3d 235, 252 (2d Cir. 2014).

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (quoting *Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 582 F.3d 244, 264 (2d Cir. 2009)). "Hearsay evidence is admissible at the summary judgment stage if the contents would [or could] otherwise be admissible at trial." *Persh v. Petersen*, No. 15 Civ. 1414, 2016 WL 4766338, at *4 (S.D.N.Y. Sept. 13, 2016). Courts must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. *See Wright*, 831 F.3d at 71–72.

### III. DISCUSSION

As explained below, NIFA's motion for summary judgment is denied as to both the contract claims and the ultra vires claim.

#### A. Contract Claims

NIFA's motion is denied as to the declaratory judgment claims (Counts II–VII) and breach of contract claim (Count XI) because GE has adduced sufficient admissible extrinsic

6

evidence to raise a genuine factual dispute about when the parties intended the Investment Agreements to terminate.

"Under New York law, written agreements are construed in accordance with the parties' intent and the best evidence of what parties to a written agreement intend is what they say in their writing." *Schron v. Troutman Sanders LLP*, 986 N.E.2d 430, 433 (N.Y. 2013) (internal quotation marks omitted).[2] Where, as here, a court has determined that the language of an agreement is ambiguous, "the parties may submit extrinsic evidence as an aid in construction, and the resolution of the ambiguity is for the trier of fact." *State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985); *accord Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011). Thus, a determination that a contract is ambiguous ordinarily requires denial of summary judgment unless "the evidence presented about the parties' intended meaning is so one-sided that no reasonable person could decide the contrary" or "the non-moving party fails to point to any relevant extrinsic evidence supporting [its] interpretation of the language." *Luitpold Pharm., Inc. v. Ed. Geistlich Sohne A.G. Fur Chemische Industrie*, 784 F.3d 78, 88 (2d Cir. 2015).

When construing an ambiguous contract, "the court may accept any available extrinsic evidence to ascertain the meaning intended by the parties during the formation of the contract." *N.Y. Marine & Gen. Ins. Co. v. Lafarge N. Am., Inc.*, 599 F.3d 102, 114 (2d Cir. 2010) (applying New York law). Extrinsic evidence may include "the acts and circumstances surrounding execution of the ambiguous term," *Roberts v. Consol. Rail Corp.*, 893 F.2d 21, 24 (2d Cir. 1989),

---

[2] All parties agree that the choice of law provision in the Investment Agreements requires application of New York law to the entire action. *See, e.g.*, *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) ("The parties' briefs assume that New York substantive law governs the issues . . . presented here, and such implied consent is, of course, sufficient to establish the applicable choice of law.").

"conversations, negotiations and agreements made prior to or contemporaneous with the execution of a written [agreement]," *Mooney v. AXA Advisors, L.L.C.*, 19 F. Supp. 3d 486, 506 (S.D.N.Y. 2014) (quoting *67 Wall St. Co. v. Franklin Nat. Bank*, 333 N.E.2d 184, 186 (N.Y. 1975)), and "the parties' course of conduct throughout the life of the contract," *Hoyt v. Andreucci*, 433 F.3d 320, 332 (2d Cir. 2006). Extrinsic evidence may also include industry custom and practice if certain requirements are met. *Christiania Gen. Ins. Corp. of N.Y. v. Great Am. Ins. Co.*, 979 F.2d 268, 274 (2d Cir. 1992); *accord Last Time Beverage Corp. v. F & V Distribution Co., LLC*, 951 N.Y.S.2d 77, 81–82 (2d Dep't 2012) ("A party who seeks to use trade usage to define language or annex a term to a contract must show either that the other party was actually aware of the trade usage, or that the usage was so notorious in the industry that a person of ordinary prudence in the exercise of reasonable care would be aware of it.").

NIFA objects to much of the extrinsic evidence that GE has proffered in support of its interpretation of the Investment Agreements. These objections are overruled for purposes of this motion. Regarding several pieces of evidence, NIFA argues that one party's uncommunicated subjective intent is not admissible extrinsic evidence. Although such evidence may be of limited use to the factfinder, it has some probative value and is not per se inadmissible. *See SR Int'l Bus. Ins. Co. v. World Trade Ctr. Props., LLC*, 467 F.3d 107, 126 (2d Cir. 2006) (applying New York law) ("At least with respect to a negotiated agreement, a party's subjective understanding, while not controlling, may shed light on the state of those negotiations and could bear on that party's objective actions."); *Constellation Power Source, Inc. v. Select Energy, Inc.*, 467 F. Supp. 2d 187, 209 (D. Conn. 2006) ("The better reading of New York law, and certainly the Second Circuit's interpretation of New York law on this point, is that extrinsic evidence of subjective intent is admissible if a contract term is ambiguous."); *cf. Wells v. Shearson Lehman/Am. Exp.,*

*Inc.*, 526 N.E.2d 8, 15 (N.Y. 1988) ("Uncommunicated subjective intent alone cannot create an issue of fact where otherwise there is none.").

NIFA's other objections fare no better. First, NIFA argues that Patronis' testimony lacks foundation because he did not participate in drafting the Investment Agreements. Patronis did participate in the bidding process, however, and he testified about bidding for the Investment Agreements at issue here and for GICs generally. His testimony is admissible extrinsic evidence of the acts and circumstances surrounding execution of the Investment Agreements, and the custom and practice in the GIC industry. *See Roberts*, 893 F.2d at 24; *Christiania*, 979 F.2d at 274. Second, NIFA contends that statements by several of its own employees constitute post hoc interpretations of the agreements and are inadmissible legal conclusions. Nonetheless, the statements may be admitted as extrinsic evidence of NIFA's post-execution course of conduct. *See Hoyt*, 433 F.3d at 332. Finally, NIFA asserts that two parts of Seema Mohanty's expert testimony lack foundation because she does not have experience drafting investment agreements. Mohanty does have substantial experience in the municipal finance industry as a banker and consultant, and can testify about industry custom and practice with regard to negotiating the terms of investment agreements. *See* Fed. R. Evid. 702; *Christiania*, 979 F.2d at 274.[3]

With those objections aside, the extrinsic evidence offered by GE in support of its interpretation of the Investment Agreements is substantial. All but one of the bid forms, which

---

[3] NIFA also objected to the expert reports of Mohanty, Ellen Pesch and Mark Norell because they were unsworn. *See Berk v. St. Vincent's Hosp. & Med. Ctr.*, 380 F. Supp. 2d 334, 352 (S.D.N.Y. 2005) ("Courts in this Circuit have uniformly held that unsworn expert reports do not satisfy the admissibility requirements of Fed. R. Civ. P. 56(e), and cannot be used to defeat a summary judgment motion without additional affidavit support."). This objection is denied as moot because GE subsequently submitted sworn declarations from Mohanty, Pesch and Norell affirming their reports.

NIFA drafted, provided for termination upon bond redemption and stated that the resulting agreement "must conform to the term of the bid and the bidding specifications." There is no evidence in the record that the parties negotiated the termination provision in the Investment Agreements to change the terms of the bids after the bidding process. Patronis and Mohanty testified that such negotiations would be highly unusual in the industry and would have affected the pricing. NIFA's post-execution course of conduct -- including its agreement to indemnify Wells Fargo for leaving the Investment Agreements open after termination and its internal emails anticipating objections from GE -- also tends to undermine NIFA's assertion that the parties negotiated the termination provision after the bid was awarded. In sum, the extrinsic evidence is not so one-sided in favor of NIFA's interpretation that no reasonable person could decide for GE. *See Luitpold Pharm.*, 784 F.3d at 88.

NIFA's contrary arguments involve weighing the evidence and resolving factual disputes and thus cannot prevail on summary judgment. NIFA argues that GE's evidence of an industry standard is not probative of the parties' intent because the standard is not universal in the industry and is contradicted by other GE investment agreements, which explicitly provide for termination upon bond redemption. This argument is unavailing at this stage because there is conflicting evidence in the record regarding the alleged industry standard, and multiple inferences could be drawn from the fact that 3% of GE's investment agreements from the relevant time period include the explicit termination language.

The evidence about GE's other investment agreements also undermines NIFA's argument that "[e]ven where there is ambiguity, if parties to a contract omit terms -- particularly, terms that are readily found in other, similar contracts -- the inescapable conclusion is that the parties intended the omission." *Quadrant Structured Prods. Co. v. Vertin*, 16 N.E.3d 1165, 1172 (N.Y.

2014). Here, the termination upon redemption term was omitted from only a small handful of GE's investment agreements (58 of 1,857 or about 3%), creating doubt as to whether the term is "readily found" in such contracts. Also, there were contracts with other issuers, and even one with NIFA, without the explicit termination language that nonetheless terminated upon redemption of the bonds. This evidence about GE's other investment agreements distinguishes *Quadrant* and raises a factual dispute as to the significance of the omitted term.

Because the extrinsic evidence in the record is sufficient for a reasonable juror to find in favor of GE's interpretation of the termination provision, NIFA's motion for summary judgment is denied as to the declaratory judgment and breach of contract claims.

### B. Ultra Vires Activity

NIFA's motion for summary judgment is denied as to GE's ultra vires claim. Activity is ultra vires if it is "beyond the scope of power allowed or granted by a corporate charter or by law." Black's Law Dictionary (10th ed. 2014); *cf. BLF Assocs., LLC v. Town of Hempstead*, 870 N.Y.S.2d 422, 425 (2d Dep't 2008) ("Towns and other municipal authorities have no inherent power to enact or enforce zoning or land use regulations. They exercise such authority solely by legislative grant and in the absence of legislative delegation of power, their actions are ultra vires and void." (internal quotation marks omitted)).

GE's ultra vires claim, as clarified in its opposition to the motion, is that NIFA acted ultra vires by not investing funds "in the manner permitted by the indenture securing such bonds," as it is required to do by statute, Neb. Rev. Stat. § 58-240. Specifically, GE contends that NIFA is violating the indentures by transferring mortgage prepayments into the Revenue Fund instead of into the Redemption Fund. Contrary to NIFA's argument, this alleged violation is distinct from conduct underlying the contract claims -- which concern NIFA's continued deposits and

acceptance of interest payments under the Investment Agreements. Consequently, the ultra vires claim is not duplicative of those claims, and NIFA's arguments about its authorization to keep those Investment Agreements open are irrelevant. In addition, NIFA does not address its argument challenging the ultra vires claim in its reply "and is therefore deemed to have abandoned this argument." *In re Hoti Enters., L.P.*, No. 13 Civ. 3638, 2014 WL 1244779, at *4 (S.D.N.Y. Mar. 26, 2014), *aff'd*, 605 Fed. App'x 67 (2d Cir. 2015) (summary order). NIFA's motion for summary judgment is therefore denied as to the ultra vires claim.

## IV. CONCLUSION

For the foregoing reasons, Defendant Nebraska Investment Finance Authority's motion for partial summary judgment is DENIED.

The Clerk of Court is respectfully directed to close the motion at Docket No. 95.

Dated: July 6, 2017
New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**